Filed 6/5/23  P. v. McPherson CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS LEONEL MCPHERSON,<br><br>Defendant and Appellant. | B313401<br><br>(Los Angeles County<br>Super. Ct. No. TA148115) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed in part and remanded with instructions.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Appellant Thomas McPherson appeals from his conviction on three counts of sexual abuse of two minors, his daughter, Z., and stepson, J. He contends the court erred by allowing expert testimony on child sexual abuse accommodation syndrome (CSAAS) beyond the permissible scope of that testimony. He also argues that the jury was improperly instructed with CALCRIM No. 1193 that it could use the expert's CSAAS testimony to judge the credibility of the victims. Finally, he asserts that the trial court failed to recognize its discretion in imposing consecutive sentences on two of the counts, an error that respondent Attorney General concedes requires remand. We conclude that appellant has not established any prejudicial error with respect to the CSAAS testimony or related jury instruction. We therefore affirm appellant's convictions and remand for resentencing on counts one and three.

# PROCEDURAL HISTORY

In 2019, appellant was charged by amended information in count one with sexual intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a))[1] and in count three[2] with committing a lewd act on a child under 14 (§ 288, subd. (a).) Both counts were alleged to have been committed against appellant's eldest daughter, Z.

Jury trial began on August 7, 2019. On August 22, 2019, the court declared a mistrial after the jury was unable to reach a verdict on either charge.

After the court granted the prosecution's motion to consolidate two pending cases against appellant, the information was amended in November 2020 to add count four, charging appellant with oral copulation of a person under 14 (§ 288a, subd. (c)(1)) against victim J. The amended information

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Count two, alleging a violation of section 288.5, was dismissed and is not relevant to this appeal.

further alleged an enhancement for multiple victims under age 14 pursuant to section 667.61, subdivisions (b) and (e).

Jury trial began on the consolidated case on May 24, 2021. On June 10, 2021, the jury found appellant guilty on all counts. The jury also found the multiple victim enhancement true.

The court sentenced appellant to 55 years to life in state prison, consisting of a term of 25 years to life on count one, 15 years to life on count three, and 15 years to life on count four, with the terms on count three and count four to run consecutively pursuant to section 667.61, subdivision (i).

Appellant timely appealed.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

#### A. *Z.'s testimony*

Z. was 17 years old at the time of trial. She testified that in June 2011, she was eight years old and her sister, V., was four; they were living with their mother in Perris, California. Appellant was living by himself in a converted garage in Compton. Z. and V. would stay with appellant every other weekend, sleeping on a couch in the living room. Z. testified that the first incident occurred when she was eight, while she was asleep on the couch with V. Z. stated that she did not remember the details clearly, but she recalled waking up in appellant's bedroom on his bed. Appellant was touching her on her bottom and upper legs and it made her uncomfortable. She also testified that appellant put his penis in her vagina. She did not understand why it was happening and she felt uncomfortable and scared. Z. testified that this happened more than once, and that afterward it would hurt and burn when she tried to use the bathroom. Z. recalled seeing blood when she used the restroom afterward on two occasions.

Z. also testified about another incident, which she stated occurred when she was nine or 10 and was the only incident that occurred while she was awake. Appellant and his girlfriend, Merle, were arguing and he was doing Z.'s hair. Appellant became angry and either he or his girlfriend closed the bedroom door, leaving appellant and Z. in the bedroom. Appellant then pulled Z. from the chair where she was sitting, pulled down her pants, bent her over the bed, and raped her. Z. testified that this happened in Inglewood, where

appellant was living with Merle, their baby daughter I., and Merle's two children, Jo. and J.

After appellant and Merle broke up, appellant moved in with his cousin Roman in Hawthorne. Z., who was 10 or 11 years old, visited appellant there two or three times with her sisters, V. and I. She testified that on one occasion, she, V., and I. stayed in appellant's room and Z. purposely slept next to the wall so appellant "wouldn't come and touch me." Roman and another roommate were not at home at the time. Z. woke up during the night and found her body had moved. She did not remember specifically everything that happened, but she recalled that her sisters were asleep, that appellant put his penis in her vagina, and that it hurt.

Z. also recalled the last incident with appellant, which occurred on January 1, 2016. Z. was 12 years old and had travelled with appellant, V., and I. to Arizona to celebrate the new year with appellant's cousin and his wife. Appellant and his cousin went out on New Year's Eve, while the children stayed home. Z. testified that she went to sleep on an upper bunk with V., while I. went to bed in the bottom bunk. V. was against the wall. Z. woke up during the night, when it was dark and everyone was asleep. When she awoke, her legs were over the side of the bed, appellant was standing on the bottom bunk, and he was doing "nasty things" to Z. Z. explained that appellant had his mouth on her vagina and she felt very uncomfortable. Next, appellant told her to get down from the top bunk and Z. complied because she was scared. Appellant then put his penis in her vagina. Z. testified that this lasted for about 10 minutes and it hurt. At some point during this incident, I. (then three or four years old) woke up and appellant told her to go back to sleep.

Z. could not recall the details of each incident but testified that in addition to those she had discussed, there were more than five other incidents, all occurring in Compton or Inglewood. Appellant put his mouth on her vagina another time in Compton. He also forced her to put her mouth on his penis, which made her "feel very, very uncomfortable." On that occasion, Z. was sleeping with V. and appellant brought Z. into his bedroom. Appellant pushed Z.'s head down and his penis went into her mouth for a few minutes.

4

Z. stated that she did not tell anyone about the abuse until 2018 because she was scared and did not know if anyone would believe her. She explained that even though "that stuff happened to me . . . I still loved my dad," and did not think people would believe her because from the outside it looked like they had a good relationship. She was embarrassed and was also afraid that if she told anyone that appellant would try to hurt her and her mom.

Before she disclosed the abuse, Z. pretended everything was okay. She would tell herself that each incident was the last time and would try to focus on believing it would not happen again. She explained that she tried to act normally and would try to think that she could visit appellant and the abuse would not happen again. Z. also acknowledged that at one point, she asked to live with appellant. At that time, she and her mother were "going through a rough time" and fighting, so she "thought it would have been better living with my dad." She thought maybe appellant had changed and would not continue the abuse if she lived with him.

During cross-examination, Z. acknowledged that she continued to be affectionate with appellant, continued to text him, and never told her mother or anyone that she did not want to see appellant. When she was interviewed by a social worker in 2016, she said she wanted to live with appellant and denied any sexual assault.

Z. submitted to two forensic interviews with Malinda Wheeler at the Children's Advocacy Center, in September 2018 and February 2019. Z. testified that the first interview was more difficult because it was the first time she had really talked about what happened. She recalled telling Wheeler about at least one time where appellant put his penis in her anus, but at trial she testified that she did not remember that incident clearly. She thought it occurred in Compton, that it happened once or twice, and recalled that it hurt.

**B.    J.'s testimony**

J. was 17 years old at the time of trial. In July 2014, when he was nine years old, he was living in Inglewood with his mother Merle, his sister Jo., his half-sister I. (born in 2013), and appellant, who was dating his mother. One day, Merle was at work and appellant, J., and I. were home. J. testified that

5

he was watching television with I. in the living room when appellant called J. into the bedroom. Appellant was sitting on the bed and he pulled down his pants and underwear and pointed at his exposed penis. J. could not recall whether appellant's penis was erect and could not recall whether appellant said anything during the incident. J. proceeded to put appellant's penis in his mouth and perform oral sex for about two minutes. Appellant then pushed J. away, pulled up his pants, and J. left the room. This was the only incident between appellant and J.

J. testified that he had seen oral sex in movies prior to this incident, including the movie *American Me*. J. did not tell anyone until 2018, because it was "kind of embarrassing" and he thought he might get in trouble. J. acknowledged that he was interviewed by a social worker in 2015 and 2016 and denied being molested or performing oral sex on anyone. J. stated during cross-examination that he told his sister Jo. about the incident in 2016, but she "brushed it off" and thought it was a joke. After that he "just kind of let it go." He then told his father and stepmother about the incident in 2018.

Los Angeles Sheriff's Department detective Adam Hilzendeger described the sex scenes in "American Me" as involving graphic forced sexual intercourse and sodomy. He acknowledged that none of those scenes involved oral sex.

C.    *Forensic interviews and examination*

Malinda Wheeler, a registered nurse and sexual assault forensic examiner, conducted forensic interviews with J. in 2019 and Z. in September 2018 and February 2019. In her testimony at trial, she described a forensic interview as a "neutral non leading, non suggestive fact-finding conversation with a child" where there is a disclosure or a concern about child abuse. She testified that based on her background, training, and experience, it is common for victims to disclose a small amount of information at a time about abuse. She explained that it is not her job as a forensic interviewer to tell if a child is telling the truth, but to "believe that they believe what happened to them and to give them an opportunity to give me as many details as possible."

During Wheeler's testimony, the prosecution played the forensic interviews of J. and Z. for the jury. Wheeler testified that the demeanor and

ability to recall of both victims was appropriate and consistent based on her experience in the field with sexual abuse victims.

Z. was 15 years old at the time of the first forensic interview in September 2018. During that interview, Z. identified the first incident, which occurred when she was eight or nine years old and staying with appellant in Compton. Z. also recalled incidents at Merle's house in Inglewood, during which she would wake up in appellant's room and he would put his penis in her vagina. She also discussed the incident in Arizona, stating that appellant put his mouth on her vagina and then his penis in her vagina while she was asleep and that she was too scared to say anything. She could not give many other details regarding these incidents.

Z. recalled one incident where appellant put his fingers in her vagina but did not remember where that happened. She also told Wheeler that once in Compton appellant tried to have Z. put her mouth on his penis. She was asleep and remembered "feeling something touching my mouth, and I felt very uncomfortable." She also remembered appellant putting his penis in her anus, once in Compton and once in Inglewood. She was fairly certain he did not use lubrication and it hurt. During one of those incidents, she felt something wet on her bottom and stated that she thought appellant ejaculated.

Z. stated that she decided to tell her mother about the abuse in 2018 because it was making her angry and was interfering with her relationship with her mother. Z. estimated that the abuse happened eight times. It did not happen on every visit with appellant, just "every few times." She did not think V. ever saw any of the abuse and stated that V. denied appellant ever doing anything to her.

Wheeler also conducted a sexual assault examination of Z. following the initial forensic interview in 2018. She testified that it was a "non acute" examination because more than five days had passed since the last incident, so the examiner was looking for "past healed trauma," rather than collecting DNA evidence. She testified that she found indications of healed trauma in two tears to Z.'s hymen. The location of one of the tears was significant as it was "typical of penetrating trauma" rather than congenital. Wheeler also testified that Z.'s injuries were consistent with the allegations of abuse that

Z. made during the forensic interview. She acknowledged that she could not tell from the examination when the injuries to Z.'s hymen occurred.

Z. submitted to a second forensic interview in February 2019. Wheeler testified at trial that she did not expect to conduct a second interview with Z., but she was told that Z. had more to talk about. According to Wheeler, Z.'s demeanor was much different in the second interview. She was more forthcoming and more relaxed.

During the second interview, Z. explained that she had been going to counseling since their last interview. Z. gave additional details regarding the first incident, which happened when she was eight years old during a weekend visit to appellant's house. She and V. were asleep on the couch and appellant came into the room and started tapping her shoulder like he was trying to wake her up. Z. ignored appellant and tried to go back to sleep because she did not know what was happening. Then she remembered appellant putting her over his shoulder, taking her into his bedroom, and laying her down on the bed. He started touching her side, legs, and bottom, then removed her underwear. Appellant then put his penis into either her vagina or anus; Z. could not recall which. She did not know what made him stop. Z. just remembered waking up in appellant's bed the next morning. Appellant was next to her but did not say anything.

Z. also remembered details regarding the incident at Merle's house, when appellant was arguing with Merle. She stated that appellant finished doing V.'s hair and told Z. to go to his room so he could do her hair. Then he locked the doors to the room and started kissing her body, which made Z. very uncomfortable. Appellant told Z. to pull her pants down, bent her over the bed and put his penis in her vagina. She recalled this incident and another that occurred at Merle's house when she was nine or 10 years old. Z. also remembered that appellant put his mouth on her vagina two or three times. She stated that appellant tried to put his penis in her mouth once but she kept her mouth closed and resisted when he tried to force her head down. She recalled that appellant ejaculated twice, once in Inglewood and once in Arizona; it went on her back or arm. Z. stated that once in Inglewood appellant hugged her and said he was sorry; that was the only time he said anything after the abuse.

Z. also told Wheeler additional details regarding the last incident in Arizona.  The girls were in bunk beds and she woke up with her legs over the side of the top bunk.  Appellant was standing on the bottom bunk, putting his mouth on her vagina and licking it.  Z. did not remember how she got down but recalled that she ended up on the bottom bunk and appellant put his penis in her vagina.  Z. also recalled assuming a position with her face in the pillow and her bottom in the air but didn't recall how she got in that position.  Z. stated that after this incident, when she used the restroom it burned and there was blood.

Z. explained that the abuse would not happen on every visit and if it did not happen, she would think "maybe he stopped."  She stated that she was scared of what appellant might do because he "is a very scary person."  She would pretend to be asleep during the abuse.

J. was 14 years old at the time of his interview with Wheeler.  He stated that he was around 10 when the abuse occurred.  He had known appellant for about two years and appellant had been living with J.'s family for about a year.  In the interview, J. stated that appellant called J. into the bedroom, pulled his shorts down, pointed to his penis, and then pulled J.'s head down.  J. began to orally copulate appellant, which he knew how to do from movies he had seen, including *American Me*.  After about two minutes, appellant told J. to leave and to "go watch TV."  J. left the room and drank some water.  He did not tell anyone because he was embarrassed.  After that, J. tried not to be alone with appellant.  Appellant moved out of the home that same year.

**D.    *CSAAS testimony***

Dr. Jayme Jones is a clinical psychologist who treats sexual abuse victims and conducts forensic interviews.  She testified at trial that she had not interviewed anyone involved in the case or reviewed any of the reports; instead, she explained that she was testifying only as "an independent expert in the field of child sexual abuse."  She described CSAAS as a model used "to help explain the behavior of children following abuse," which "helps to explain some of the disclosure patterns [by child victims] that are contrary to common belief."  She also explained to the jury that she referred to CSAAS as a "model" rather than a "syndrome" because it is "not something you can use

to diagnose. It is not something you can use to determine whether or not someone has been abused."

Jones detailed the five parts of the CSAAS model. The first part, secrecy, refers to the fact that abuse "typically happens in secret with no witnesses. And because of that, there's an unspoken message to the child that they shouldn't talk about it." Jones opined that it was common for child sexual abuse to occur with other people in the home or even sleeping in the same room. She stated that she had heard from victims that there were other people in the same home or same room, especially at night when the others were asleep, and she had worked with children "where there were other people in the same bed."

The second part, helplessness, involves the smaller physical size of a child, which explains "in part, why they don't fight back." Helplessness also refers to the "social helplessness" of children, meaning that they often cannot physically leave a bad situation or may feel helpless to do anything other than what an adult is telling them to do. Jones testified that "most children who are abused will freeze. They will pretend they're somewhere else," rather than actively fighting back. This helplessness also impacts disclosure, because if "you don't feel like you have any ability to stop an incident . . . then you learn how to cope with it." She also testified that freezing "impacts how [the victim is] processing what's happening and their ability to remember what's happening." She explained that "if, in a moment of trauma, you shut down, right, you're not actively encoding or taking in what's going on around you. It's just a blur. So that what then happens is later, if you ask someone about the details of an event, they may not be aware of the details." She explained that a victim saying "I don't remember," could mean "I don't want to talk about it," or "it's too painful" to discuss, or that "the memory was never there to begin with."

The third part of the model, accommodation, refers to the strategies a child uses "to accommodate or deal with ongoing abuse . . . rather than being able to stop it." Jones gave an example of a child pretending to be asleep during the abuse. When asked whether it would surprise her to hear that a child took an action, such as sleeping on the other side of the bed with their siblings in between them and the abuser, she said it would not, because

"children take steps that make them feel better even if they're not actually helpful." Jones also testified that "[m]ost children pretend that everything is fine until they can't." As such, she stated that she would not be surprised to learn that a child who is being abused was affectionate toward their abuser, went on vacation with their abuser, and continued to have an active relationship with them. She noted that it surprises people that "children who are abused are still affectionate toward the person abusing them," and that "even if abuse has happened nine of the ten previous times . . . they will go into that next situation with the hope and the belief that it will be fine." She also stated that abuse by one parent could affect the child's relationship with the other parent, most commonly through feelings of anger toward the other parent because he or she did not figure out what was happening.

Jones explained that the fourth part, delayed disclosure, "addresses the fact that, unlike the assumption that children would immediately disclose, the reality is most never do." Jones further explained that the "most common reaction in trauma is not to say anything," and then when the child does disclose, they may partially disclose a little information at a time to see if there is a positive or negative reaction.[3] She estimated that somewhere between 10 and 15 percent of child sexual abuse victims disclose within the first year, an additional 20 to 25 percent will disclose within five years, and more than half never disclose. A negative reaction to an initial disclosure makes it less likely that the child would continue to disclose.

Responding to additional questions regarding disclosure, Jones opined that "the closer the child is to the person molesting them, the less likely it is that they'll disclose," because they don't want to upset the abuser, they care about the abuser, and it is a more confusing and more complicated situation for the child. Further, she noted that children will behave as expected, showing affection toward family members and thus it is common to see children acquiesce to the abuse rather than running away or saying no. Jones stated that most children she has worked with have said that they

---

[3] The fifth part, not relevant here, is recantation, addressing a situation where a child made a disclosure, but then recants when faced with a negative response.

thought an adult was more likely to believe the abusing adult than to believe them, and that it is common for a child to deny abuse, even when asked about it directly.

Jones also testified about the difficulty in remembering details, stating that people expect trauma survivors to remember specific details, such as dates, to an unrealistic extent, but "that's not how our brain works." She further explained that often, when someone is in shock, he or she is not encoding a memory that can later be retrieved. According to Jones, children are not as good as adults at "sequencing," and telling narratives from beginning to end; instead a child's disclosures "tend to be much more all over the place."

During cross-examination, Jones confirmed that the creator of the CSAAS model, Dr. Summit, wrote an article objecting that the model was being used incorrectly, in that "[p]eople were using it to predict whether or not children had been abused, which is not an appropriate usage." She confirmed that it was incorrect to say that if a child's story fit the model, it would confirm that the child was abused. Jones agreed with Dr. Summit that it would be inappropriate to use the model "to make determinations or opinions about whether or not abuse had occurred." When asked by defense counsel whether the model was being used inappropriately in this case, she responded, "[n]ot at all. I have no opinions . . . about whether or not the children involved in this case have been abused." During redirect examination, she reiterated that the model is not predictive but should be used for education and to help people understand.

## II. Defense Evidence

Appellant testified that he has four children, three daughters and a son. In 2011, he was living in Compton. Z. and V. would visit, sometimes every other weekend, sometimes less. The girls would sleep on the couch during their visits. Appellant denied ever sleeping in the same bed with his daughters. He further denied all of the allegations by Z. and J.

Appellant confirmed that he began dating Merle in 2012 and moved in with her in Inglewood that same year. I. was born in 2013 and Merle's son J. lived there as well. Appellant denied being left alone with J. and I. However, during cross-examination, appellant acknowledged that Merle would

12

sometimes work early in the morning and he would stay with the children, although he stated that J. was rarely there.

In 2016, Z. requested to live with him because she said she could not deal with her mother. She would tell appellant she wanted to live with him every time they talked. Appellant also testified that Z. was not always honest, that "a lot of times she would lie depending upon the situation." He thought her accusations were coming from her mother.

Appellant lived with his friend Charles and his second cousin Roman from August to December 2014 in a converted industrial loft in Hawthorne. Both Charles and Roman testified that appellant's daughters visited the loft on a few occasions in 2014 but never spent the night. Roman described appellant as a caring person and stated that he had never seen him act inappropriately toward children.

Appellant's cousin, Herminio, and his partner, Necole, both testified regarding the time appellant and his daughters stayed at their house in Arizona for New Year's Eve. Necole testified that appellant, Z., V., and I. arrived at their home on December 31, 2015. That night, appellant and Herminio went out, while Necole stayed home with the three girls and her son. She and the children went to sleep shortly after midnight, with the three girls sleeping in a spare bedroom. Appellant and Herminio returned home around 3:00 a.m. When Necole woke up the next morning, she saw appellant sleeping on the sofa in the living room.

Herminio testified that he and appellant returned home on New Year's day around 2:30 a.m. and then played video games. A little while later, Herminio went to bed and left appellant sleeping on the sofa. He stated that he heard appellant snoring "all night pretty much." Herminio got up around 8:00 a.m. and saw appellant on the sofa. During cross-examination, Herminio acknowledged that when he saw appellant in the morning, appellant was in a different position on the sofa. Herminio also acknowledged that he thought the snoring he heard overnight was either appellant or I., who also snores loudly. Both Necole and Herminio testified that they spent time with Z. the next day and did not observe her acting unusually.

Appellant's mother testified that she never saw Z. avoid appellant or withhold affection from him. She stated that appellant was very loving toward his children and that he is a good person. She described Z. as having a strong personality and as someone who would stand up for herself, but also stated that Z. was not always honest and had lied to her.

Appellant's girlfriend testified that she started dating him in 2014. Beginning in 2015, every other weekend, they would pick up Z., V., and I. and take them to their home for the weekend. She described appellant as very loving with the girls and stated that she never saw him act inappropriately toward children. She also testified that Z. was not always truthful.

## DISCUSSION

### I.   CSAAS Testimony

Appellant contends that Jones's testimony exceeded the permissible scope of a CSAAS expert when she responded to questions by the prosecutor that closely tracked the facts of the case. As such, he argues that Jones's testimony allowed the jury to "apply the syndrome to the facts of the case and conclude" that Z. and J. were sexually abused. Appellant also asserts that a small portion of Wheeler's testimony was inadmissible on the same basis. We agree with respondent that most of appellant's current objections have been forfeited. Moreover, even if we were to consider the merits of the claim, we would conclude there was no prejudicial error.

### A.   *Legal framework*

It has long been held that expert testimony on CSAAS is admissible for the limited purpose of disabusing the jury of common misconceptions about how child victims may react to sexual abuse. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 394–395 (*Bowker*).) As the California Supreme Court explained, CSAAS evidence is "not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors

14

of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301, fn. omitted.)

The expert providing CSAAS testimony may not give "'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Bowker, supra*, 203 Cal.App.3d at p. 393.) Nor is it proper for an expert to present "predictive conclusions," such as alleged child abuse victims "should be believed" or "abused children give inconsistent accounts and are credible nonetheless." (*Id*. at pp. 393-394.)

In *Bowker*, the court held that "the evidence [regarding CSAAS] must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Bowker, supra*, 203 Cal.App.3d at pp. 393-394.) "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.)

"'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'" (*People v. Duong* (2020) 10 Cal.5th 36, 60; see also *McAlpin, supra*, 53 Cal.3d at p. 1299.)

## B. *Analysis*

### 1. *Forfeiture*

As an initial matter, respondent contends that appellant has forfeited objections to Jones's and Wheeler's testimony that he did not raise below. Appellant counters that he sufficiently preserved the issue by objecting several times to hypothetical questions posed by the prosecution during Jones's testimony, and once during Wheeler's testimony; he argues that further objection would have been futile.

We agree with respondent that appellant failed to properly object before the trial court. Appellant identifies a handful of portions of Jones's

testimony that he claims involved case-specific facts and are thus outside the proper scope of CSAAS evidence.  In the first such response, Jones stated that in her experience, she had worked with victims who were abused while other people were in the home or even sleeping in the same room, including with children "where there were other people in the same bed."  Defense counsel did not object, nor had he previously raised any objections to the scope of Jones's testimony.  Next, appellant identifies several areas of Jones's testimony: (1) discussing how a child may freeze during abuse, and how that reaction can impact the child's ability to process and recall the details of the event; (2) that, in her experience, a child stating "I don't remember" certain details could have several meanings; (3) the misconception that "children who are abused are still affectionate toward the person abusing them," and that she would not be surprised to learn that a child continued a relationship with the abuser and even accompanied the abuser on vacation; (4) that it is common for a child who is asked directly about abuse to deny being abused; and (5) that a child may cope with abuse by pretending to be asleep, or taking other actions such as wearing multiple layers of clothing or sleeping on the far side of the bed.  Defense counsel did not object to any of this testimony.  Moreover, up to this point in Jones's testimony, he had only raised a single objection regarding scope, to an unrelated question regarding whether adults in the abused child's family may feel guilty once a disclosure is made because they were not aware of the abuse.[4]

Defense counsel next objected that the prosecutor's question whether it would surprise Jones "to hear that a child, at some point in time, asks to live with a parent who was an abuser," was an "inappropriate hypothetical."  The court overruled the objection.

Jones then testified regarding abuse affecting the relationship between the child and the non-abusing parent.  She also opined that a child is unlikely to continue to disclose abuse following a negative reaction to initial disclosure, and agreed with a hypothetical by the prosecutor that "if a child made the disclosure, for instance, to an older sibling, and the reaction was to not believe them or thinking they were joking, could that have an impact on

---

[4] Defense counsel objected that this question was "outside the scope," which the court overruled.

whether or not the child would then go on to disclose further?" This testimony was met with no objection from defense counsel. Later, defense counsel raised his third objection regarding whether a child's difficulty in remembering details of abuse could affect how the child is perceived by other adults. The court overruled the objection that this question called for speculation and was "outside the scope."

With respect to Wheeler's testimony, appellant points to her statements that, based on her experience, it is common for a family to have only one sibling who is a victim while other siblings are not, for other victims to come forward once one victim has disclosed, and that multiple victims may not have shared their stories with one another. Defense counsel raised no objection to the prosecutor's questions eliciting this testimony. The prosecutor then asked Wheeler whether, in her experience, it is "unusual for a suspect to have adult girlfriends, adult sexual relationships while also seeking out sexual relationships with children." The court overruled defense counsel's objection that this was "outside the scope; lacks foundation," and Wheeler responded that it was common.

In sum, apart from the few questions to which defense counsel raised objections, appellant failed to preserve his claim on appeal by raising specific and timely objections to the testimony by Jones and Wheeler. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 186 ["questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal"].) Moreover, appellant has not shown that objection would have been futile. (See, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 587.) Although appellant points to the fact that the trial court overruled the few objections he raised, most of the testimony to which he now objects was given prior to those rulings. Furthermore, appellant has not demonstrated how his scattered objections to four specific questions by the prosecutor rendered any further objection to the scope of CSAAS testimony futile, particularly given the length and breadth of the testimony by Jones and Wheeler. Thus, he has forfeited this claim.

Alternatively, appellant argues that his trial counsel was ineffective for failing to adequately object to the CSAAS testimony. We are not persuaded

that appellant has met his heavy burden to establish ineffective assistance on direct appeal. Appellant must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696.) And where, as here, "the appellate record does not reveal whether counsel had a legitimate reason for a litigation choice, we generally reserve consideration of any ineffective assistance claim for possible proceedings on petition for writ of habeas corpus." (*People v. Snow* (2003) 30 Cal.4th 43, 95.)

Here, appellant has not demonstrated that there could be no satisfactory explanation for counsel's lack of objection. (*People v. Kipp* (1998) 18 Cal.4th 349, 366–367.) As such, appellant has not shown ineffective assistance of counsel.

### 2. *The testimony was properly admitted*

Even if we considered the merits of appellant's objections, we would conclude that the court did not err in allowing the CSAAS testimony. Appellant does not dispute that he challenged the credibility of both Z. and J. and, therefore, that some limited CSAAS evidence was admissible. Instead, he raises two claims of error regarding the identified portions of Jones's testimony—first, that the evidence was not targeted to dispelling a specific misconception at issue in the case, and second, that Wheeler's testimony adhered too closely to the facts of the case, thus encouraging the jury to "apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Bowker, supra*, 203 Cal.App.3d at p. 393.) We would find no error as to either claim.

Appellant first contends that the challenged portions of Jones's testimony were not "aimed at dispelling any prevalent misconceptions or elucidating any CSAAS factor," but were instead "intended to lead the jury to conclude" that because Z. and J.'s "conduct was consistent with that of child sexual abuse victims, they must have been sexual abuse victims as well." We disagree.

18

As outlined above, the challenged portions of Jones's testimony included discussions of abuse taking place with other individuals asleep in the home or in the room, the effect on a child of freezing during abuse, other coping mechanisms such as sleeping on the far side of the bed, a child's continued relationship with the abuser, and denial of abuse or partial disclosure. This testimony, as explained by Jones, was squarely aimed at misconceptions regarding the first four parts of the CSAAS model, namely secrecy, helplessness, accommodation, and delayed disclosure. These misconceptions were also directly at issue here, as appellant argued in particular that Z.'s continued close relationship with him and the delayed disclosure by both victims undercut their credibility. As such, we find that the prosecution's questions related to specific misconceptions relevant to the case and were therefore properly the subject of CSAAS evidence.

Second, appellant claims that the prosecutor improperly asked Jones a number of hypothetical questions using facts that were "obviously similar" to the facts of the case and elicited Jones's agreement that such conduct was common for abuse victims. We disagree with appellant's characterization of these questions as thinly veiled attempts to allow Jones to opine on the specific facts of this case under the guise of giving expert CSAAS testimony. Many of the "case-specific facts" that appellant points out were broadly applicable to many abuse victims, rather than being descriptive of specific conduct of the children here. For example, Jones discussed a victim's continued affection toward an abuser, denial and partial disclosure, inability to recall details of abuse, and the occurrence of abuse with other individuals in the home or room. While these characteristics were exhibited by Z. and J. here, it does not follow that they were so "case-specific" as to elicit improper testimony from Wheeler. Moreover, in several instances, Wheeler gave multiple examples of common conduct, some of which matched the evidence and some which did not. In one such instance, Wheeler discussed several possible coping mechanisms a child might use, including pretending to be asleep (present here), wearing multiple layers of clothing (not present), and sleeping on the far side of the bed with a sibling in between (present).

Under these circumstances, we find that Jones was properly applying the CSAAS model to describe the behavior of children as a class and their

19

common reactions to sexual abuse, rather than the specific conduct of the children involved in this case. Although some of Jones's testimony corresponded with Z.'s and J.'s behavior, we find no abuse of discretion in the trial court's conclusion that the testimony helped explain behaviors common to victims of child sexual abuse that might appear to a jury to be self-impeaching and contradictory. (*McAlpin, supra*, 53 Cal.3d at p. 1301; see also *People v. Patino, supra*, 26 Cal.App.4th at p. 1745 [admitting CSAAS testimony where it "was offered for the limited purpose of explaining why [the complaining witness] did not immediately inform anyone of her molestation and why she slowly revealed the details of the molestation"].) Appellant has cited no case rejecting CSAAS testimony under similar circumstances. We therefore conclude that Jones's testimony was properly aimed at neutralizing misperceptions regarding common behaviors of abuse victims and was properly admitted.

We reject appellant's attempt to apply the limitations of CSAAS evidence to Wheeler's testimony. Wheeler did not identify herself as an expert in CSAAS and indeed, did not discuss the CSAAS model at all. Rather, she testified as a percipient witness having performed the forensic interviews of Z. and J. and the sexual assault examination of Z., and also offered her opinion on certain topics based on her experience as a forensic examiner. Thus, appellant's challenge to Wheeler's testimony as improper CSAAS evidence is without merit. Further, to the extent he seeks to challenge portions of her testimony as improper lay opinion, he has not met his burden to establish error on appeal.

### 3. *Any error was harmless*

Finally, even assuming it was error to allow Jones to respond to the prosecutor's hypothetical questions, we would find that the error was harmless. Any risk that the jury might improperly infer abuse from the CSAAS testimony was all but eliminated by the many instances in which the jury was told that it could not rely on the expert's testimony to find the children had in fact been sexually abused. Not only did Jones deny any familiarity with the facts or witnesses in the case, she also repeatedly testified during both direct and cross-examination that the CSAAS model should not be used to determine if abuse has occurred or to help a jury

determine whether a witness is telling the truth. She also expressly told the jury that she had no opinion about whether Z. and J. had been abused.

Further, both sides emphasized the limited use of CSAAS testimony during closing argument. The prosecutor reminded the jury that CSAAS "is not a predictive model. We don't use it to say, oh, that means that we were abused. . . . You look at the model and determine were Z[.] and J[.]'s actions consistent with this model? They could help you understand the way that they did things." Similarly, defense counsel cautioned the jury that Jones's testimony was not for the purpose of "finding that sexual assault occurred."

In addition, the trial court properly instructed the jury that Jones's testimony did not constitute evidence of appellant's guilt and could be used only for the limited purpose of deciding whether the conduct of Z. and J. was not inconsistent with the conduct of someone who has been molested and evaluating the believability of Z. and J.'s testimony. We presume the jury followed these instructions. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

Under these circumstances, we find any possible error in admitting Jones's testimony was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 837 [no reasonable probability that the outcome would have been different in the absence of the alleged error]; see also *Bowker, supra*, 203 Cal.App.3d at p. 395 [improper admission of expert's CSAAS testimony that went beyond rehabilitating the complaining witness's credibility was harmless].)[5]

## II.    CALCRIM No. 1193

Appellant relatedly challenges the court's use of CALCRIM No. 1193, the standard instruction on CSAAS testimony. Here, the court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jayme Jones regarding child sexual abuse accommodation syndrome. Dr. Jones's testimony about child sexual abuse accommodation

---

[5] We similarly reject appellant's contention that the admission of CSAAS evidence violated his due process rights. (*People v. Patino, supra*, 26 Cal.App.4th at p. 1747 ["Appellant has failed to demonstrate how his fundamental right to a fair trial was violated by the introduction of CSAAS testimony."].)

syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Z[.] or J[.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his or her testimony." Appellant contends that this instruction improperly allowed the jury to consider CSAAS evidence in evaluating the believability of the complaining witness's testimony, which is "no different than telling the jury that it may use the CSAAS evidence to determine whether the complaining witness's claims are true." He argues that the instruction therefore lessened the prosecution's burden of proof and violated his constitutional rights. We review instructional error claims under a de novo standard of review. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.)

Appellant acknowledges that every Court of Appeal to consider this argument has rejected it. (See *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176 [holding that CALCRIM No. 1193 "accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence"]; accord, *People v. Picazo* (2022) 84 Cal.App.5th 778, 805; *Munch, supra,* 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503504 (*Gonzales*).)

In *Gonzales*, as here, the defendant argued that "the misleading language of CALCRIM No. 1193 allowed" the jury to use the CSAAS expert's testimony "as proof that [the victim] was molested." (*Gonzales, supra*, 16 Cal.App.5th at p. 503.) According to the defendant, it was "impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that [the defendant] committed the charged crimes." (*Ibid*.)

The appellate court rejected this argument, concluding that a "reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that the [victim's]

apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Gonzales, supra*, 16 Cal.App.5th at p. 504; *Munch, supra*, 52 Cal.App.5th at pp. 473–474.) As such, the jury instruction accurately reflects the law regarding the proper use of CSAAS evidence and it neither violates due process nor misapplies the burden of proof. (*Lapenias, supra*, 67 Cal.App.5th at p. 175, citing *Gonzales, supra*, 16 Cal.App.5th at pp. 503–504.)

We agree with the court's analysis in *Gonzales*. Nothing in the instruction used in this case told the jury, as appellant suggests, that because Z. and J. engaged in conduct addressed by the CSAAS model, such as delayed disclosure, that it was more likely they had in fact been abused. Rather, the instruction simply informed the jury that if it believed Jones's testimony, it could find the children's ostensibly self-impeaching behavior did not in fact affect the believability of their testimony. This is exactly the purpose for which CSAAS evidence is admissible. (*McAlpin, supra*, 53 Cal.3d at p. 1300.) We therefore conclude the court did not err in instructing the jury using CALCRIM No. 1193.

## III.   Sentencing

The trial court sentenced appellant to a total term of 55 years to life, consisting of a term of 25 years to life on count one, 15 years to life on count three, and 15 years to life on count four. The court stated it was imposing consecutive sentences on counts three and four based on the fact that the crimes involved separate victims and also pursuant to section 667.61, subdivision (i), the mandatory consecutive sentencing provision of the One Strike Law.

Appellant contends the matter must be remanded for resentencing because section 667.61, subdivision (i) only provides for mandatory consecutive sentencing as to count four. As such, the court had discretion to determine whether to impose a concurrent or consecutive sentence on count three, but failed to recognize that discretion. (See § 667.61, subdivisions (c)(7), (i); *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.) Additionally, the court could not impose a consecutive sentence on count three based on a finding that the crimes involved separate victims, as counts one and three both involved victim Z.

Respondent agrees that the matter should be remanded for resentencing, as do we.  We therefore remand the matter for resentencing to allow the court to exercise its discretion to impose counts one and three consecutively or concurrently.

## DISPOSITION

The matter is remanded for resentencing.  The judgment of the trial court is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


CURREY, ACTING, P.J.


STONE, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.